## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

DONALD FERGUSON,                          )
                                          )
    Plaintiff,        )
                                          )
    v.                )     CAUSE NO.: 3:11-CV-486 JVB
                                          )
OSCAR O COWEN, JR., Sheriff of Starke     )
County, OSCAR O. COWEN, JR.,              )
Individually, and STARKE COUNTY,          )
INDIANA, by and through its               )
Commissioners, DAN BRIDGEGROOM,           )
JENNIFER DAVIS, and KATHY NOREM,          )
                                          )
    Defendants.       )

## OPINION AND ORDER

This matter is before the Court on the Defendants' Motion for Summary Judgment [ECF No. 33] filed on December 10, 2012. In their Motion, the Defendants contend that they are entitled to summary judgment on the Plaintiff's constructive discharge, First Amendment retaliation, and intentional infliction of emotional distress claims. The Plaintiff, Donald Ferguson, a former Starke County Sheriff's deputy, alleges that Defendant Oscar Cowen, Jr., the Starke County Sheriff, retaliated against him following the May 2010 primary election in which the Plaintiff supported Defendant Cowen's opponent. For the following reasons, the Court will grant in part and deny in part the Defendants' Motion.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be granted so

long as no rational fact finder could return a verdict in favor of the party opposing the motion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Id.* at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A material fact must be outcome determinative under the governing law. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id.*

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed.

Beginning in 2000, the Plaintiff became acquainted with Defendant Cowen through golf trips with the Plaintiff's brother-in-law. (Ferguson Dep. 32–33, ECF No. 38-1.)[1] In the three to four years prior to his hiring by the Starke County Sheriff's Department (the Sheriff's Department), the Plaintiff played golf with Defendant Cowen in a weekly league during which time they became good friends. (*Id.* 33–34.) Defendant Cowen was elected Sheriff of Starke County in January of 2007. (*Id.* 32.) Following his election, he hired the Plaintiff to work as a probationary officer for the Sheriff's Department. (*Id.* 31–32.) Upon being hired, the Plaintiff trained at the Indiana Law Enforcement Academy and began to work night shifts. (*Id.* 40.) In 2009, the Plaintiff began to work a day shift after another officer was promoted to a detective spot. (*Id.*) During his employment at the Sheriff's Department, the Plaintiff and Defendant Cowen continued to play golf together. (Ferguson Dep. 40)

In 2010, Defendant Cowen was up for re-election. (*Id.* 61.) Chief Deputy Bill Dulin[2] ran against Defendant Cowen in the Democratic primary election. (*Id.*) At the time the Plaintiff learned of Dulin running against Defendant Cowen, the Plaintiff still considered himself to be friends with Defendant Cowen. (*Id.* 63.) The Plaintiff was also friends with Dulin. (*Id.*) When Defendant Cowen learned of Dulin's opposition, he did not ask the Plaintiff for support. (*Id.* 64.) During the months leading up to the primary, the Plaintiff did not actively support either

---

[1] The parties have submitted two versions of the Plaintiff's deposition. The Court relies primarily on the Plaintiff's version [ECF No. 38-1] but reviewed the Defendants' version [ECF No. 34-1] when considering their Motion for Summary Judgment.

[2] At that time, Dulin was a detective in the Sheriff's Department. (*Id.* 61–62.)

candidate and did not make contributions to either candidate's campaign. (*Id.*)[3] The Plaintiff cast his vote for Dulin because "[he] didn't care for the direction that the department was going" under Defendant Cowen's leadership. (*Id.* 64–65.) Prior to the election, the Plaintiff did not inform anyone of his decision to vote for Dulin and Dulin did not know that the Plaintiff was going to vote for him. (*Id.* 65.)

After Defendant Cowen's victory in the primary election, the Plaintiff did not support Defendant Cowen or the Republican candidate in the general election. (*Id.* 66.) At some point following the primary election, the Plaintiff became convinced that Defendant Cowen knew of his support for Dulin. (*Id.*) According to the Plaintiff, Defendant Cowen's attitude towards him changed following the primary election—Defendant Cowen would no longer engage in conversation with him or eat lunch with him. (*Id*. 67.)

In the Plaintiff's view, Defendant Cowen began to retaliate against him in a variety of ways for supporting Dulin. Following an incident in which a criminal suspect fired on the Plaintiff and other law enforcement officers, Defendant Cowen issued AR-15 rifles to all of the deputy sheriffs but the Plaintiff. (Ferguson Dep. 152.) Defendant Cowen then denied the Plaintiff the opportunity to attend various law enforcement training sessions, including sniper training. (*Id.* 59–60, 82, 84.) Further, when the Plaintiff applied for a vacant detective position, Detective Cowen promoted a less senior deputy sheriff to the position. (*Id*. 81–82.)

In February 2011, with the approval of Chief Deputy Dulin, the Plaintiff taught a firearms training class to officers from several local police departments. (*Id.* 99–105.) On his

---

[3] There is a factual dispute as to whether the Plaintiff merely voted for Dulin or actually campaigned for Dulin.

next paycheck, the Plaintiff was docked eight hours pay for failing to get authorization from

Defendant Cowen prior to teaching the class. (*Id.* 105–07.) Upset over Defendant Cowen's

behavior, on March 25, 2011, the Plaintiff recorded a conversation concerning his paycheck with

Defendant Cowen. (*Id.* 17–18; *see* Sheriff Recording, ECF No. 39-3.) The Plaintiff and

Defendant Cowen disagreed as to whether another officer had authorized the Plaintiff to teach

the class. The disagreement between the parties escalated and the Plaintiff stated that he was

"tired of getting screwed over" and asked Defendant Cowen, "Why are you so pissed off at me?"

(Sheriff Recording 3.) Defendant Cowen stated that he had already provided the Plaintiff with an

explanation:

| | |
|---|---|
| Plaintiff: | You don't think I as least deserve that much to know why you won't talk to me? |
| Defendant Cowen: | I explained this to you once before. |
| Plaintiff: | No you didn't. |
| Defendant Cowen: | Yes I did. |
| Plaintiff: | Well I don't recall it. Explain it to me again. |
| Defendant Cowen: | About how you campaigned against me? |
| Plaintiff: | I didn't campaign against you. |
| Defendant Cowen: | You didn't? |
| Plaintiff: | Prove it Oscar, prove it. |

(*Id.*) After further discussion of the Plaintiff "clocking out" of work without authorization, the

following exchange took place:

| | |
|---|---|
| Plaintiff: | So you are saying I am fucking with you? |
| Defendant Cowen: | Well you campaigned against me. |

| | |
|---|---|
| Plaintiff: | I didn't campaign against you. |
| Defendant Cowen: | I know you campaigned against me. |
| Plaintiff: | No you don't know that I did. |
| Defendant Cowen: | Yes I do. |
| Plaintiff: | Well then produce some fucking tapes about it if you are so sure. I would like to see them. |
| Defendant Cowen: | I don't carry that little camera with me everywhere I go or I probably could. |

(*Id.* 4–5.)

The Plaintiff worked on the day shift from 2009 until August 2011, at which time the Defendant assigned him to work the night shift again. (Ferguson Dep. 40–41.) After being informed by Chief Deputy Dulin that he was being moved to night shift, the Plaintiff attempted to discuss his shift change with Defendant Cowen. (*Id.* 41–43.) According to the Plaintiff, Defendant Cowen stated that he did not owe the Plaintiff an explanation. (Ferguson Dep. 44.)[4] The Plaintiff's pay, benefits, and job duties remained the same whether he worked day or night shift. (*Id.* 45.)

On September 9, 2011, the Plaintiff sold his house in Knox, Indiana. (*Id.* 15.) The Plaintiff and his family moved into a rental house in Culver, Indiana, and resided there from September 2011 to February 2012. (*Id.*) On February 22, 2012, the Plaintiff presented Defendant Cowen with his resignation letter. (*Id.* 12.) Shortly thereafter, the Plaintiff and his family moved to Las Vegas, Nevada, on February 27. (*Id.* 11.)

---

[4] That conversation between the Plaintiff and Defendant Cowen was not recorded. (*Id.* 44.)

**ANALYSIS**

The Plaintiff raises claims of constructive discharge, First Amendment retaliation, and intentional infliction of emotional distress. The Court will address each of these claims in turn.

**A.     Constructive Discharge**

The Defendants argue that they are entitled to summary judgment because the Plaintiff's work conditions were not so intolerable as to constitute a constructive discharge. In the Defendants' view, the Plaintiff voluntarily resigned from the Starke County Sheriff's department and no reasonable jury could find that the Plaintiff's work environment was unbearable. In his Response, the Plaintiff addresses his constructive discharge and First Amendment retaliation claims in combination and heavily focuses on his First Amendment retaliation claim. In their Reply, the Defendants observe that the Plaintiff failed to address their arguments related to his constructive discharge claim, emphasizing that the case relied on by the Plaintiff dealt solely with a First Amendment retaliation claim.

To prevail on a claim of constructive discharge, a plaintiff must "demonstrate a work environment that is even more egregious than that needed for a hostile work environment such that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401–02 (7th Cir. 2010) (internal quotation omitted).[5] In cases finding constructive

---

[5] A second form of constructive discharge takes place "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (internal quotation marks omitted). This occurs when, "based on an employer's actions, the handwriting [was] on the wall and the axe was about to fall." *Id.* (internal quotation marks omitted). The Plaintiff has not raised such a claim in this case.

discharge, the Seventh Circuit has focused on threats of physical harm, or on emotional harassment that is truly beyond the pale. As this Court recently stated:

> In *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992), the court found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head. In *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir. 1989), the plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her. *In Porter v. Erie Foods, International, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009), the court held that a claim for constructive discharge was possible where the harassment included repeated use of a noose and implied threats of physical violence. In *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006), the court found that a reasonable jury could conclude that the plaintiff should have quit to immediately protect herself where the jury could find that the plaintiff's supervisor "was an obsessed man who-based on previous acts showing no regard for [the plaintiff]'s right to control who could touch intimate areas of her body-was capable of, and desirous of, physically assaulting her in a serious way."

*Rhoads v. Rieth-Riley Constr. Co., Inc.*, No. 3:11–CV–366–TLS, 2013 WL 1281749, at *12 (N.D. Ind. Mar. 26, 2013).

Here, the Plaintiff has not presented the Court with any such evidence of physical harm or extreme emotional harassment. Following Defendant Cowen's re-election as Starke County Sheriff, his relationship with the Plaintiff deteriorated. The Plaintiff alleges that Defendant Cowen sought to punish him for supporting Defendant Cowen's opponent in the Democratic primary election. The undisputed facts show that: Defendant Cowen would no longer socialize with the Plaintiff; Defendant Cowen issued patrol rifles to all of the deputy sheriffs except for the Plaintiff; Defendant Cowen refused to allow the Plaintiff to attend additional law enforcement training; Defendant Cowen promoted a less senior deputy sheriff to a detective's position over the Plaintiff; Defendant Cowen docked the Plaintiff's pay for his teaching of a

firearms class without Defendant Cowen's authorization; and Defendant Cowen moved the Plaintiff from day shift to night shift. The facts show that the Plaintiff's workplace was unpleasant, not unbearable. The harassment and petty slights to which the Plaintiff was subjected are inconsistent with basic principles of civility and professionalism, but they do not rise to the level of egregiousness that would allow a reasonable jury to find that the Plaintiff's working conditions were intolerable. Therefore, the Court will enter summary judgment in favor of the Defendants on the claim of constructive discharge.

**B.      First Amendment Retaliation**

The Plaintiff's First Amendment retaliation claim is the central issue in this case. From the outset, the Defendants acknowledge that the recorded conversation between Defendant Cowen and the Plaintiff  "arguably creates a genuine issue of material fact on Ferguson's First Amendment claim." (Defs.' Mem. in Supp. 12, ECF No. 34.) However, the Defendants argue that an independent basis for granting summary judgment on the Plaintiff's retaliation claim exists. The Defendants note that, to establish a prima facie First Amendment retaliation claim, the Plaintiff must present evidence that (1) he engaged in constitutionally protected conduct; (2) he suffered a deprivation that would likely deter First Amendment activity by him in the future; and (3) Defendant Cowen's conduct was the "but for" cause of the alleged deprivation. (*Id.* 12–13 (citing *Zellner v. Herrick*, 639 F.3d 371, 378–79 (7th Cir. 2011)).) According to the Defendants, the Plaintiff has failed to present evidence that satisfies the second and third elements of this standard. In response, the Plaintiff relies heavily on the Seventh Circuit's decision in *Wallace v. Benware*, 67 F.3d 655 (7th Cir. 1995). Emphasizing the factual

similarities between *Wallace* and the present case, the Plaintiff contends that Defendant Cowen's actions amounted to ongoing retaliatory harassment sufficient to support a claim of First Amendment retaliation.

1.      *Official Versus Individual Capacity*

The Plaintiff has sued Defendant Cowen in his individual and official capacity for First Amendment retaliation under 42 U.S.C § 1983. Section 1983 imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. 42 U.S.C. § 1983. Actions under Section 1983 against individual defendants in their official capacities are treated as suits brought against the government entity itself. *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012). Individual capacity suits "'seek to impose individual liability upon a government officer for actions taken under color of state law.'" *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). In his Amended Complaint [ECF No. 24], the Plaintiff requests only monetary damages for Defendant Cowen's alleged violation of his First Amendment rights. (Am. Compl. ¶ 15, ECF No. 24.) In his official capacity, Defendant Cowen is immune from claims for monetary damages under Section 1983. *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (citing *Brown v. Budz*, 398 F.3d 904, 917–18 (7th Cir. 2005) ("To the extent [the plaintiff] seeks monetary damages from defendants acting in their official capacity, those claims . . . are dismissed as they are barred by the Eleventh Amendment.")). Additionally, the Plaintiff's claim against Starke County, Indiana, by and through its Commissioners Dan Bridegroom, Jennifer Davis, and Kathy Norem,

fails for the same reasons.[6] Therefore, the Court considers only the Plaintiff's individual capacity claim against Defendant Cowen.

2.      *Relevant Case Law*

To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate "'(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions.'" *Peele v. Burch*, — F.3d —, 2013 WL 3455705, at *2 (7th Cir. July 9, 2013) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012), *cert. denied*, —— U.S. ——, 133 S. Ct. 489 (2012)).

First, a court must determine whether a plaintiff's speech is constitutionally protected—this is a question of law, not fact. *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013). To make this determination, a court analyzes: (1) whether the plaintiff was speaking "as a citizen"; (2) whether the plaintiff spoke on a "matter of public concern"; and (3) whether balancing the plaintiff's interest, as a citizen, in commenting on the matter against the state's interest, as an employer, in promoting effective and efficient public service weighs in favor of deeming the speech "protected." *See Spiegla v. Hull*, 481 F.3d 961, 965–66 (7th Cir. 2007) [hereinafter *Spiegla II*].

Next, a plaintiff must present evidence of a "deprivation" likely to deter the exercise of his First Amendment rights. *Kidwell*, 679 F.3d at 964. A First Amendment retaliation claim

---

[6] The caption in this case suggests only Defendant Cowen was sued in his individual capacity. The Plaintiff has not suggested otherwise with respect to the Commissioners.

"does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964." *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) [hereinafter *Spiegla I*] (citing *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000)). "Rather, '*[a]ny* deprivation . . . that is likely to deter the exercise of free speech . . . is actionable.'" *Spiegla I*, 371 F.3d at 941 (quoting *Power*, 226 F.3d at 820). While isolated criticisms are not sufficient to meet this standard, *see Mosely v. Bd. Educ. of Chi.*, 434 F.3d 527, 534 (7th Cir. 2006), "retaliatory harassment need not be extreme" to be actionable, *Massey v. Johnson*, 457 F.3d 711, 720 (7th Cir. 2006). Indeed, " harassment of a public employee violates the First Amendment 'unless the harassment is so trivial that a person of ordinary firmness would not be deterred from . . . expressing those beliefs.'" *Id.* (quoting *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989)).

Finally, a plaintiff must present evidence showing a causal connection between his protected speech and the alleged retaliation. In other words, a plaintiff must demonstrate that "his speech was at least a motivating factor in the employer's actions.'" *Kidwell v*, 679 F.3d at 964. Following the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), district courts struggled to understand whether they should apply the "but for" test seemingly required by *Gross* or the traditional "motivating factor" standard with respect to the causation element. Fortunately, the Seventh Circuit has clarified its position with respect to this element:

> [P]reliminarily at summary judgment, the burden of proof is split between the parties. Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor—or, in philosophical terms, a "sufficient condition"—of the employer's decision to take retaliatory action against him. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter

> the plaintiff's evidence, then the employer's retaliatory actions are considered a
> "necessary condition" of the plaintiff's harm, and the plaintiff has established the
> but-for causation needed to succeed on his claim.

*Kidwell*, 679 F.3d at 965 (internal citations and footnote omitted). *See also Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (at summary judgment a plaintiff must identify evidence demonstrating that plaintiff's constitutionally protected speech was at least a motivating factor in the employer's decision to retaliate.

A plaintiff may demonstrate that his constitutionally protected speech was at least a motivating factor in a defendant's retaliatory actions through direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965. "'Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Id.* (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). In contrast, circumstantial evidence is evidence that allows a trier of fact to infer that retaliation occurred. *Kidwell*, 679 F.3d at 965 (citing *Rudin*, 420 F.3d at 720–21). Examples of circumstantial evidence include "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Kidwell*, 679 F.3d at 966 (quoting *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)). "[R]egardless of which type of evidence is offered, to demonstrate the requisite causal connection in a retaliation claim, a plaintiff must show that the protected activity and the adverse action are not wholly unrelated." *Kidwell*, 679 F.3d at 966 (quotation marks and brackets omitted).

3. *The Seventh Circuit's Decision in* Wallace v. Benware

In *Wallace v. Benware*, 67 F.3d 655 (7th Cir. 1995), the plaintiff was hired as a full-time deputy sheriff in 1990 in Polk County, Wisconsin. *Id.* at 656. The plaintiff's primary responsibility was to administer the department's D.A.R.E. program. *Id.* In addition to his responsibilities as D.A.R.E. program coordinator, the plaintiff worked as a boat patrol officer. *Id.* On June 4, 1992, the plaintiff announced his candidacy for the position of Polk County Sheriff. *Id.* Following this announcement, the defendant-sheriff's attitude towards the plaintiff changed. *Id.* The defendant refused to speak with the plaintiff and began to "subtly harass" the plaintiff. *Id.* The week after the plaintiff announced his candidacy, the defendant removed him from boat patrol despite the fact that he was the department's only certified marine patrol officer. *Wallace*, 67 F.3d at 657.

Following the plaintiff's removal from boat patrol, the defendant "undertook a series of actions that generally made life as a deputy sheriff more difficult for [the plaintiff]." *Id.* at 657. The defendant denied the plaintiff use of a portable radio and ordered the plaintiff to leave the radio while on patrol. *Id.* Before announcing his intention to run for the office of Polk County Sheriff, the plaintiff had regularly used a radar unit in the course of his work as a patrol officer. *Id.* After the plaintiff's radar unit malfunctioned that summer, the defendant instructed the plaintiff to operate his patrol car without a radar unit and refused to allow the plaintiff to use a spare unit. *Id.* When the plaintiff's unit was repaired, the defendant installed it in his own patrol car. *Id.* Prior to announcing his candidacy, the plaintiff had been permitted to keep his patrol car on his off-duty days. *Id.* Following his announcement, the defendant ordered the plaintiff to leave his patrol car at the office on the weekends. *Id.*

The defendant similarly interfered with the plaintiff's ability to work effectively as the

department's D.A.R.E. program coordinator. *Id.* When the plaintiff ordered materials for his D.A.R.E. classes, the defendant canceled the order. *Id.* The plaintiff was forced to obtain additional materials from a D.A.R.E. instructor employed by the National Park Service. *Id.* Further, at the beginning of the school year, the plaintiff traditionally mailed a letter to parents of his D.A.R.E. students explaining the purpose of the program. *Id.* In the late summer of 1992, the defendant refused to permit the plaintiff to distribute these letters. *Id.* at 658. A year later, in the summer of 1993, after the conclusion of the plaintiff's D.A.R.E. classes, the defendant ordered the plaintiff to clean out a shed, a training room, three stalls in a garage, and an evidence room "that had not been cleaned for approximately thirty years." *Id.*

Finally, in February 1993, the plaintiff responded to a hostage situation at a residential home. *Id.* As the plaintiff and two other deputies approached the home, the armed suspect fired shots at them. *Id.* Additional officers arrived at the scene and helped establish a perimeter around the house. *Id.* The plaintiff took cover near the house. *Id.* When the defendant arrived on the scene, he ordered the plaintiff to be relieved and ordered the plaintiff to leave his covered position. *Id.* In response, the plaintiff and other deputies at the scene questioned the defendant's order, emphasizing that, if the plaintiff left his position, he could potentially be shot by the armed suspect. *Id.*

The district court denied the defendant's motion for summary judgment on the plaintiff's First Amendment retaliation claim. *Id.* at 659. At trial, the jury found that the defendant was liable on the plaintiff's First Amendment retaliation claim. *Id.* On appeal, the defendant argued that he was entitled to judgment as a matter of law on the plaintiff's First Amendment claim based on the Seventh Circuit's decision in *Upton v. Thompson*, 930 F.2d 1209 (7th Cir. 1991),

*cert. denied*, 503 U.S. 906 (1992). In *Upton*, the Seventh Circuit considered First Amendment claims of deputy sheriffs who had been dismissed for campaigning on behalf of candidates opposing their employers. *Id.* at 1210–11. Specifically, the court considered whether the policymaker exception to the First Amendment's ban on patronage dismissal would apply to deputy sheriffs in Illinois. *Id.* at 1218. Based on its finding that deputy sheriffs in Illinois "operate[d] with a sufficient level of autonomy and discretionary authority," the *Upton* court held that it was permissible for a sheriff to use "political considerations when determining who will serve as deputies." *Id.*

On appeal, the defendant in *Wallace* argued "that the *Upton* line of cases authorize[d] a sheriff to engage in a campaign of retaliatory harassment once a deputy decides to challenge him in an election campaign." *Wallace*, 67 F.3d at 660. The *Wallace* court rejected this argument. Under *Upton* and its progeny, the court noted, a sheriff could fire or demote a "politically disloyal" deputy to ensure the effective and efficient operation of a sheriff's department. *Id.* at 661. The court continued, contrasting the defendant's retaliatory conduct towards the plaintiff with the acts of firing or demoting a politically disloyal deputy approved in *Upton*:

> Although we presume that a deputy's dismissal is aimed at serving the public interest in efficient and effective government, it would be illogical to apply the same presumption to harassment designed specifically to hinder or to disrupt a deputy in the performance of his duties. And we believe that is a fair characterization of what the record shows here. The evidence at trial established that Benware's treatment of Wallace did not serve to enhance the efficiency and effectiveness of the Polk County Sheriff's Department. Indeed, it apparently was Benware's purpose to make it more difficult for Wallace to do his job.

*Id.* at 662. Reviewing the facts, the court emphasized that the defendant's action made it "more difficult" and "perhaps more dangerous" for the plaintiff to fulfill his responsibilities as a D.A.R.E. program coordinator and patrol officer. *Id.* Further, the court observed that the

defendant's behavior inconvenienced other deputies in the department. *Id.* In conclusion, the

court affirmed the district court's denial of summary judgment and upheld the jury's verdict.

4.   *The Plaintiff Has Presented Sufficient Evidence to Establish a Genuine Issue of Material Fact as to His First Amendment Retaliation Claim*

The Defendants contest only the second and third elements of the Plaintiff's First

Amendment claim. The Court will address each element in turn.

a.   Deprivation Likely to Deter Constitutionally Protected Speech

First, the Defendants argue that the Plaintiff has not presented evidence of a materially

adverse employment action, and, consequently, conclude that the Plaintiff cannot state a prima

facie First Amendment retaliation claim. In support of this position, they cite several Seventh

Circuit cases finding that the harassment complained of by the plaintiff did not rise to the level

of materially adverse employment actions.[7]  In their view, any actions taken by Defendant

Cowen had a de minimis impact on the terms and conditions of the Plaintiff's employment. The

Defendants' reliance on these cases is misplaced. All four cases considered the definition of

materially adverse employment actions in the context of Title VII employment discrimination

---

[7]*Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (finding that a change in working hours, without a corresponding change in compensation, did not rise to the level of a materially adverse employment action); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728–30 (7th Cir. 2001) ("Lau's decision to change Grube's working hours certainly does not rise to the level of an adverse employment action. Grube's pay and job title remained the same, and she suffered no significantly diminished job responsibilities."); *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000) (distinguishing between a bonus and a raise and recognizing that a denial of a bonus was not a materially adverse employment); *Needy v. Vill. of Woodridge*, No. 96 C 5188, 1997 WL 461093, at *6 (N.D. Ill. Aug. 8, 1997) (finding that reprimands and deprivations of training opportunities do not constitute an adverse employment action under Title VII).

cases. This standard is inapplicable to the Plaintiff's First Amendment retaliation claim. As previously noted, a First Amendment retaliation claim "does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964." *Spiegla I*, 371 F.3d at 941 (citing *Power*, 226 F.3d at 820). "Rather, '*[a]ny* deprivation . . . that is likely to deter the exercise of free speech . . . is actionable.'" *Spiegla I*, 371 F.3d at 941 (quoting *Power*, 226 F.3d at 820).

Second, while recognizing that "a campaign of petty harassment in response to a public employee's political expression may be actionable under § 1983 as a First Amendment violation," the Defendants maintain the conduct at issue in this case cannot compare to the conduct described in *Wallace*. (Def.'s Reply 4, ECF No. 42.) The Court finds that, viewing the evidence in a light most favorable to the Plaintiff, the Defendants' attempts to distinguish *Wallace* from the present case are unavailing. In May 2010, the Plaintiff supported Dulin in a primary election against Defendant Cowen. After Defendant Cowen learned of the Plaintiff's support for Dulin, the relationship between the Plaintiff and Defendant Cowen began to deteriorate. Defendant Cowen refused to speak with the Plaintiff and would no longer socialize with the Plaintiff as he had previously done. The Plaintiff and Defendant Cowen stopped playing golf together. When the Plaintiff would greet Defendant Cowen at work, Defendant Cowen would not respond and would ignore the Plaintiff's greetings.

On one occasion following the election, the Plaintiff responded to a call of a domestic dispute with his shift partner. Upon arriving at the scene, the Plaintiff learned that a man had barricaded himself in a trailer outside his mother's house. The mother requested that the Plaintiff remove her son from the trailer. After conversing with the mother, the Plaintiff learned that the

son had weapons in the trailer. When requested to leave the trailer, the son refused to leave and stated that he "was not coming out alive." The Plaintiff pulled back from the trailer and instructed his shift partner to call for back-up. While his partner called for back-up, the Plaintiff attempted to call Defendant Cowen to inform him of the situation. Defendant Cowen did not answer either of the Plaintiff's two calls, but answered immediately when the Plaintiff's partner called.

The Plaintiff identified other instances of what he believed to be retaliatory conduct on the part of Defendant Cowen. Defendant Cowen denied the Plaintiff the opportunity to attend law enforcement training classes; the other officers in the Sheriff's Department were still authorized to receive training. Similarly, following a firefight with an armed suspect, Defendant Cowen issued AR-15 rifles to all of the officers in the Sheriff's Department except for the Plaintiff. The Plaintiff was not provided a patrol rifle despite the availability of extra rifles.

Prior to the election, the Plaintiff had regularly taught a firearms instruction class for local law enforcement agencies whose officers needed firearms certification. If the classes conflicted with his patrol schedule, the Plaintiff regularly used comp time for which he would be compensated. After his re-election, instead of permitting the Plaintiff to use comp time for his work as a firearms instructor, Defendant Cowen began to dock the Plaintiff's pay. Defendant Cowen docked the Plaintiff's pay on two separate occasions in February 2011, which led the Plaintiff to record his conversation with Defendant Cowen in March 2011. In mid-to-late 2011, a detective position opened up in the Sheriff's Department. The Plaintiff applied for the open position. Despite having seniority and the support of the detectives at the Department, Defendant Cowen promoted a less senior deputy to the detective position. In August 2011, Defendant

Cowen changed the Plaintiff's shift and ordered the Plaintiff to work nights. The Plaintiff had previously worked the night shift from 2007 to 2009 during which time other officers were permitted to patrol with him. After the Plaintiff returned to the night shift in 2011, Defendant Cowen refused to allow other officers to patrol with the Plaintiff.

The similarities between the facts of this case and *Wallace* are readily apparent. Similar to *Wallace*, the facts presented by the Plaintiff suggest that Defendant Cowen engaged in an ongoing campaign of petty harassment against the Plaintiff. As in *Wallace*, Defendant Cowen's attitude towards the Plaintiff changed after he engaged in constitutionally protected political activities—Defendant Cowen ignored the Plaintiff in social settings and refused to communicate with him. As in *Wallace*, Defendant Cowen denied the Plaintiff readily available equipment that would have helped the Plaintiff perform his job in a safe, efficient, and effective manner.

Additional instances of harassment are present here that were not present in *Wallace*. Here, following the election, Defendant Cowen singled out the Plaintiff and denied him training opportunities. Further, Defendant Cowen passed the Plaintiff over for a promotion. Finally, despite its accepted practice prior to the election, Defendant Cowen docked the Plaintiff's pay on several occasions for his work as a firearms instructor following the election.

The Defendants question whether these deprivations were serious enough to dissuade a reasonable person of ordinary firmness from engaging in constitutionally protected First Amendment activities. In particular, the Defendants emphasize that the most egregious form of retaliation in *Wallace* involved the defendant-sheriff's behavior that placed the plaintiff's life in danger. Implicitly, the Defendants argue that, because Defendant Cowen's behavior never rose to the egregious level of the defendant-sheriff's behavior in *Wallace*, the *Wallace* holding is of

20

limited significance to the instant case. The Court disagrees with this argument. The *Wallace* court's predominant concern was whether the defendant's conduct promoted the public's interest in efficient and effective government, 67 F.3d at 662, not whether it endangered the plaintiff's life. Considering all of the evidence, including the incident in which the defendant-sheriff's behavior potentially endangered the plaintiff's life, the *Wallace* court concluded that, in the aggregate, the defendant's conduct made it more difficult for the plaintiff to do his job and inconvenienced other deputies in the department, contrary to the public's interest in efficient and effective governance. *Id.* That the plaintiff's life was endangered by the defendant was only one factor in the court's analysis.

The central holding of *Wallace* is this: While a sheriff may dismiss or demote a politically disloyal deputy, he may not retain such a deputy and then engage in a campaign of harassment designed specifically to hinder or to disrupt a deputy in the performance of his duties. *Id.* In the Plaintiff's version of events, supported by admissible evidence, Defendant Cowen's actions disrupted the performance of the Plaintiff's duties. From denying the Plaintiff equipment and training to refusing to communicate with the Plaintiff, Defendant Cowen made it more difficult for the Plaintiff to perform his job responsibilities in an efficient and effective manner. Consistent with the Seventh Circuit's holding in *Wallace*, the Court finds that the Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to the second element of a First Amendment retaliation claim.

b.    Causal Connection

Second, the Defendants equivocate on the causal connection element. On the one hand,

21

the Defendants concede that the recorded conversation between the Plaintiff and Defendant Cowen "arguably creates genuine issues of material fact on Ferguson's First Amendment claim" as to the causal relationship between the protected First Amendment activity and the alleged retaliatory deprivations. (Defs.' Mem. in Supp. 12.) On the other hand, the Defendants argue that "even if the tape recording is considered, at no time during the meeting did Sheriff Cowen ever admit that any particular actions were taken against Ferguson as a result of his support for Detective Dulin." (*Id.*) Therefore, the Defendant contends, "the tape recorded conversation does not relate to any specific employment decision, which is a requirement for any alleged direct evidence. *Oates v. Discovery Zone*, 116 F.3d 1161, 1170 (7th Cir. 1997)." (*Id.*)

As previously discussed, a plaintiff may demonstrate that his constitutionally protected speech was at least a motivating factor in a defendant's retaliatory actions through direct *or* circumstantial evidence. *Kidwell*, 679 F.3d at 965. Circumstantial evidence permits a trier of fact to infer that retaliation occurred at least in part in response to protected First Amendment activities. *Id.* at 965–66. The Plaintiff has offered the March 25, 2011, recorded conversation between himself and Defendant Cowen to establish a causal connection between his protected First Amendment activities and the alleged retaliatory deprivations. (*See* Sheriff Recording, ECF No. 39-3.) During that exchange, the Plaintiff asked Defendant Cowen why he was angry at him and refused to speak to him. (*Id.* 3.) In response, Defendant Cowen repeatedly accused the Plaintiff of campaigning against him as the reason for his behavior. Viewed in the light most favorable to the Plaintiff, the Court finds that the recorded conversation between the parties is direct evidence of a causal relationship between the Plaintiff's political activities and Defendant Cowen's refusal to speak to or socialize with the Plaintiff.

The Plaintiff also offers the deposition of the president of the Department's Merit Board as circumstantial evidence of a causal relationship between the Plaintiff's First Amendment activities and the alleged retaliatory conduct. (*See* Arnette Dep., ECF No. 39-2.) Significantly, the Defendants do not address whether the recorded conversation between the parties or the deposition testimony constitute such circumstantial evidence of a causal relationship. Kenneth Arnette's testimony shows that after the Plaintiff filed a complaint with the Merit Board, Arnette met with Defendant Cowen and inquired into the reason Defendant Cowen wished to terminate the Plaintiff. (*Id.* 22–23.) Defendant Cowen responded that the Plaintiff had campaigned against him and, after Arnette asked Defendant Cowen to sit down with the Plaintiff and work out their issues, Defendant Cowen responded "F [the Plaintiff]. Let him sue me." (*Id.* 24–25.) Arnette's testimony is further evidence of Defendant Cowen's hostility towards the Plaintiff because of the Plaintiff's political activities in support of Dulin.

Viewed in the light most favorable to the Plaintiff, the Plaintiff has presented direct and circumstantial evidence that would permit a reasonable finder of fact to conclude that there was a causal relationship between the Plaintiff's protected First Amendment activities and Defendant Cowen's alleged retaliatory conduct. Therefore, the Court will deny the Defendants' Motion for Summary Judgment as to the Plaintiff's claim of First Amendment retaliation against Defendant Cowen in his individual capacity.

**C.      Intentional Infliction of Emotional Distress**

Finally, the Defendants argue that the Plaintiff has not presented sufficient evidence to satisfy Indiana's stringent standard for a claim of intentional infliction of emotional distress.

Emphasizing that a defendant's conduct must be "extreme" or "outrageous" to satisfy the standard for intentional infliction of emotional distress, the Defendants contrast Defendant Cowen's behavior with that of the defendants in *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991) and *Gable v. Curtis*, 673 N.E.2d 805 (Ind. Ct. App. 1996). (Defs.' Mem. in Supp. 16–17.) In his Response, the Plaintiff cites *Bradley v. Hall*, 720 N.E.2d 747 (Ind. Ct. App. 1999), as a favorable example of the type of evidence that is sufficient to withstand a summary judgment challenge on a claim of intentional infliction of emotional distress. (Pl.'s Resp. in Opp'n 11–12, ECF No. 38.) According to the Plaintiff, he felt threatened by Defendant Cowen's harassment, which compelled him to resign his position and move away from Starke County. (*Id.* 12.) Further, the Plaintiff asserts that Defendant Cowen's behavior endangered his safety and well-being. (*Id.*) In conclusion, the Plaintiff argues that if Defendant Cowen's behavior does not rise to the level of outrage required to establish intentional infliction of emotional distress, "then the existence of the tort would be superfluous." (*Id.*) In reply, the Defendants distinguish *Bradley* and point to *Eli Lilly & Co. v. Green*, No. 49A02-0708-CV-710, 2008 WL 852036 (Ind. Ct. App. Apr. 1, 2008) and *Imhoff v. Kmart Stores of Indiana, Inc.*, 149 F. Supp. 2d 559 (N.D. Ind. 2001) as cases applicable to the present case. (Defs.' Reply 10–14, ECF No. 42.)

Under Indiana law, intentional infliction of emotional distress arises when a defendant: (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Waldrip v. Waldrip*, 976 N.E.2d 102, 117 (Ind. Ct. App. 2012) (citing *York v. Fredrick*, 947 N.E.2d 969, 976 (Ind. Ct. App. 2011)). As noted in *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002), Indiana courts have frequently quoted Section 46 of the Restatement (Second) of Torts to describe what constitutes

extreme or outrageous conduct:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Intentional infliction of emotional distress "'is found where conduct exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind.'" *Brown v. Indianapolis Hous. Agency*, 971 N.E.2d 181, 188 (Ind. Ct. App. 2012) (quoting *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011)). "Defining extreme and outrageous conduct depends upon the prevailing cultural norms and values." *Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 872 (N.D. Ind. 2010) (citing *Bradley*, 720 N.E.2d at 753). "Indiana courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases." *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997).

In the appropriate case, the question of what constitutes extreme and outrageous conduct can be decided as a matter of law. *Collins*, 703 F. Supp. 2d at 872 (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. Ct. App. 2001)). The Plaintiff suggests the case of *Bradley v. Hall*, 720 N.E.2d 747 (Ind. Ct. App. 1999), is an apt comparison to the instant case. In relevant part in *Bradley*, the plaintiff brought an intentional infliction of emotional distress claim

against her immediate supervisor.[8] 720 N.E.2d at 749. The plaintiff worked under her supervisor for a period of 20 years and was repeatedly subjected to shouting, criticism before fellow employees, misrepresentations as to the security of the plaintiff's employment, and harassment including asking about the plaintiff's menopause on multiple occasions and questioning the plaintiff if her husband was sexually impotent as a result of his diabetes. *Id.* Although the trial court granted summary judgment in favor of the defendant, the court of appeals disagreed and considered whether the plaintiff has presented evidence establishing extreme and outrageous conduct. *Id.* at 752. Noting that the "discuss[ion of] bodily functions and dysfunctions . . . can be personal and private topics when they concern the health or physical condition of a particular individual," the court found that "reasonable persons may differ on the questions of whether [the defendant's] conduct was extreme and outrageous and, if so, whether that conduct caused [the plaintiff] to suffer severe emotional distress," making summary judgment inappropriate. *Id.* at 753.

State and federal courts have distinguished *Bradley*, emphasizing the personal nature of the harassment and sexually explicit language at issue in *Bradley*. *See, e.g.*, *Showalter v. Richmond*, No. 1:08-CV-666-WTL-JMS, 2010 WL 746785, at *5 (S.D. Ind. Feb. 26, 2010) (noting summary judgment was inappropriate in *Bradley* since the discussion of "personal and private topics" in the workplace in *Bradley* could have been extreme and outrageous, but that the instant case was distinguished by the lack of similar comments). Furthermore, in Indiana Court of Appeals decisions, extreme and outrageous conduct is often characterized by the exposure of

---

[8] The *Bradley* plaintiff's other claims of invasion of privacy and intentional interference with a business relationship are not particularly relevant to the present analysis.

private information and/or the use of obscene and profane language in an intimidating or threatening manner. *See, e.g.*, *Johnson ex rel. Ind. Dept. of Child Servs. v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151, 162–63 (Ind. Ct. App. 2012) (denying summary judgment on intentional infliction of emotional distress claim where coroner publicly transported obese woman's remains by tow truck, winched her body onto the truck, and covered her body with a dirty carpet); *Landis v. Landis*, 664 N.E.2d 754, 755–56 (Ind. Ct. App. 1996) (award of damages for intentional infliction of emotional distress where defendant, the plaintiff's former husband, "erupted into rage" at the plaintiff in front of their daughter and employees. The defendant called the plaintiff names, belittled her, threatened her life, kicked her in the stomach, told the employees that she was no longer allowed in the office, and threatened her secretary's life). Neither of these factors is present in the instant case. Consequently, comparing *Bradley* to the present case is inapt.

The Plaintiff relies heavily on his assertion that Defendant Cowen's conduct was extreme or outrageous because it "endangered his safety and well being." (Pl.'s Resp. in Opp'n 12.) In particular, the Plaintiff emphasizes that Defendant Cowen ignored his phone calls but immediately answered his partner's call when they encountered the man who "was not coming out alive" of a trailer containing weapons during a domestic disturbance call, which the Plaintiff characterizes as an armed man and hostage situation. (*Id.*)

First, the Court notes, there is no evidence that there was a hostage involved in this situation, contrary to the Plaintiff's assertion. Second, the Plaintiff's speculation that his life and the safety of the public were endangered is not supported by the facts. Beyond conclusory assertion, the Plaintiff offers no explanation as to why or how his life was placed in danger when

Defendant Cowen ignored his phone calls. The Plaintiff's partner was able to call for back up without issue and Defendant Cowen responded to the Plaintiff's partner's calls about the situation. Third, even if the Plaintiff had presented facts showing that Defendant Cowen placed his life in danger, behavior endangering a plaintiff's life is not necessarily extreme or outrageous. *See Thurman v. Prime Quest Mgmt., LLC*, No. 1:09–cv–1453, 2010 WL 4449049, at *3–4 (S.D. Ind. Nov. 1, 2010) (landlord's actions may have caused danger to tenants but were not extreme or outrageous under Indiana law). Finally, and most significantly, the Court finds that there is an important distinction between ignoring an individual's phone call and knowingly performing an action that puts someone's life in danger. The act of ignoring a phone call is not extreme or outrageous in nature, and the Plaintiff has not cited any precedent to the contrary. Here, there is no evidence that Defendant Cowen was aware of the situation prior to speaking with the Plaintiff's partner or that he purposefully ignored the Plaintiff's phone call with an intent to endanger the Plaintiff.

In this case, the Plaintiff has presented evidence demonstrating that he was subjected to a campaign of petty harassment, ranging from the silent treatment to the denial of training opportunities and equipment, by Defendant Cowen. Although the Court has found that this evidence of petty harassment is sufficient to create a genuine issue of material fact as to the Plaintiff's First Amendment retaliation claim, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to state a claim of intentional infliction of emotional distress. Restatement (Second) of Torts § 46, cmt. d. While Defendant Cowen's conduct may have been rude and unprofessional, it was not so extreme as to lead an average member of the community to exclaim, "Outrageous!" *Id.; cf. McCreary*, 132 F.3d at 1167

(yelling at an employee and refusing to reassign the employee to a different position was not extreme and outrageous conduct); *Showalter*, 2010 WL 746785, at *5 (finding that yelling, cursing, slamming a book on the plaintiff's desk, and flinging paper in the plaintiff's direction was not extreme and outrageous under Indiana law). Therefore, the Court will grant the Defendants' Motion for Summary Judgment as to the Plaintiff's intentional infliction of emotional distress claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Defendant's Motion for Summary Judgment [ECF No. 33]. The Plaintiff's First Amendment retaliation claim remains pending before the Court.

SO ORDERED on September 23, 2013.

 s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT COURT
HAMMOND DIVISION